UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

BARBARA A. BROWN          CIVIL ACTION NO. 6:15-cv-02171

VERSUS          JUDGE DOHERTY

U.S. COMMISSIONER,          MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be REVERSED and REMANDED for further administrative action.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Barbara A. Brown, fully exhausted her administrative remedies prior to filing this action.  On June 14, 2012, she filed an application for Social Security benefits,[1] alleging disability beginning on November 3, 2009.[2]  Due to her work history, she is not eligible for disability insurance benefits ("DIB"); however, she is eligible for Medicare benefits due to her Medicare qualified government

---

[1]      Rec. Doc. 7-1 at 126.

[2]      Rec. Doc. 7-1 at 148.

employment ("MQGE") if she is disabled.[3]   The claimant's application was denied,[4] and she requested a hearing[5] which was held on August 26, 2013 before Administrative Law Judge Carol Latham.[6]   The ALJ issued a decision on March 19, 2014,[7] concluding that the claimant was not disabled within the meaning of the Social Security Act ("the Act") from November 3, 2009 through the date of the decision. The claimant asked for review of the decision, but the Appeals Council denied her request.[8]   Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on January 6, 1963.[9]   At the time of the ALJ's decision, she was fifty years old.  She finished the eleventh grade and was attempting to work

---

[3]      Rec. Doc. 7-1 at 16.

[4]      Rec. Doc. 7-1 at 64, 74.

[5]      Rec. Doc. 7-1 at 81.

[6]      The hearing transcript is found at Rec. Doc. 7-1 at 33-63.

[7]      Rec. Doc. 7-1 at 16-26.

[8]      Rec. Doc. 7-1 at 4.

[9]      Rec. Doc. 7-1 at 126.

toward a GED at the time of the hearing.[10]  She has past relevant work experience as a cashier in a retail store and as a nursing assistant for a home health agency.  She also worked for many years with intellectually challenged children at a state school in Iota, Louisiana and at the Lafayette Association for Retarded Citizens, Inc.[11]  She alleges that she has been disabled since November 3, 2009[12] due to heart attacks, diabetes, bronchial asthma, neck pain, and back pain.[13]  Ms. Brown claims that, on November 3, 2009, she had both an accident at work and a heart attack.  She alleges that her disability began that day.

Ms. Brown's primary care physicians are Dr. Mazen Korab and Dr. Yamen Korab of the Crowley Walk-In Clinic.[14]  On January 9, 2009,[15] Ms. Brown was seen at the Crowley Walk-In Clinic to get her medications refilled. Her diagnoses were hypertension, diabetes, high cholesterol, and coronary artery disease.  She was taking Metformin and Plavix.

---

[10]      Rec. Doc. 7-1 at 35, 48-50.

[11]      Rec. Doc. 7-1 at 45-46, 134, 153.

[12]      Rec. Doc. 7-1 at 148.

[13]      Rec. Doc. 7-1 at 152.

[14]      The treatment notes from the Crowley Walk-In Clinic are very hard to read, and it is impossible to determine which Dr. Korab was seen at any particular appointment.

[15]      Rec. Doc. 7-1 at 246.

Ms. Brown visited cardiologist Dr. Joseph M. Kowalski on March 31, 2009,[16] complaining of shortness of breath and left leg pain.  His impressions were coronary artery disease, non-insulin dependent diabetes mellitus, and high cholesterol.  At that time, she was prescribed Plavix, Simurestatin, Imdur, Lopressor, Lisinopril, aspirin, Lantus, and Metformin.  That same day, Ms. Brown had an MRI of her lumbar spine, ordered by Dr. Kowalski.  The findings were within normal limits.[17]  Ms. Brown saw Dr. Kowalski again on April 9, 2009,[18] complaining of left hip and leg pain.

On November 3, 2009, Ms. Brown was transferred to the Heart Hospital of Lafayette[19] after having been seen at another facility for severe chest pain and other symptoms consistent with a myocardial infarction.  Angiography showed that an existing stent had occluded.  She had not taken her Plavix for a few days, and the assessment was acute anterior myocardial infarction with stent thrombosis and restenosis secondary to stopping her Plavix.  She underwent a procedure to reopen the stent in her left anterior descending artery.

---

[16]     Rec. Doc. 7-1 at 209.

[17]     Rec. Doc. 7-1 at 204.

[18]     Rec. Doc. 7-1 at 208.

[19]     Rec. Doc. 7-1 at 199-203, 219-221.

On November 6, 2009,[20] she was seen at the walk-in clinic.  It was noted that she had a heart attack on November 3, 2009 with 100% blockage of the stent.  On November 24, 2009, she was seen at the clinic for ringing in her ears, neck pain into her shoulder, pain behind her left knee, and a numb toe.[21]

On November 25, 2009, an MRI of Ms. Brown's cervical spine showed a small central disk protrusion at C3-4 and mild spondylosis impinging on the neural foramina at C5-6 and C6-7 on the left side.[22]

Ms. Brown followed up with Dr. Kowalski on December 1, 2009, and he cleared her to return to work.[23]

On January 11, 2010, Ms. Brown saw Dr. Patrick A. Juneau, III, a neurosurgeon, with regard to her neck and low back pain.  She told Dr. Juneau that she had a heart attack while lifting a patient while at work in November 2009.  She reported that, after this incident, she experienced neck and low back pain as well as bilateral arm pain and numbness and intermittent numbness in her legs.  Upon examination, Dr. Juneau found that Ms. Brown had some tenderness and spasm to

---

[20]     Rec. Doc. 7-1 at 245.

[21]     Rec. Doc. 7-1 at 244.

[22]     Rec. Doc. 7-1 at 383.

[23]     Rec. Doc. 7-1 at 216.

palpation over the cervical and lumbar erector spinae musculature; normal strength in her upper and lower extremities; diminished pinprick and light touch sensation over the posterolateral aspect of her lower extremities extending onto her feet that did not follow any particular dermatomal pattern or any particular peripheral nerve pattern; normal reflexes in her upper and lower extremities; and a Babinski sign in both lower extremities.  Dr. Juneau reviewed the cervical MRI and concluded that it was consistent with mild degenerative changes.  In his opinion, surgery was not warranted.  He prescribed physical therapy and ordered a lumbar MRI and x-rays.

Ms. Brown followed up with Dr. Kowalski on February 9, 2010.[24]  That same day, Ms. Brown underwent transthoracic echocardiography, and Dr. Kowalski added cardiomyopathy to her other diagnoses, which were coronary artery disease, diabetes, and high cholesterol.  Dr. Kowalski encouraged Ms. Brown to take her medications as prescribed.

On February 23, 2010, Ms. Brown had an MRI of her lumbar spine, which was normal.[25]

---

[24]     Rec. Doc. 7-1 at 215.

[25]     Rec. Doc. 7-1 at 382.

Ms. Brown next saw Dr. Juneau on March 1, 2010.[26]  His report states that the MRI findings provided no basis for surgical intervention, that Ms. Brown likely sustained a whiplash type of injury that should improve over time, and that Ms. Brown "is very bothered by the persistence of [her] symptoms."  Therefore, he recommended that she undergo discograms, EMGs, and nerve conduction studies of both arms and legs.

Ms. Brown returned to Dr. Kowalski on September 27, 2010.[27]  Her blood pressure was excellent but she was still having episodes of chest pain.  She had discontinued her Imdur due to lightheadedness, another doctor had decreased her Lisinopril dosage, and she did not start Coreg because she lost the prescription.  Dr. Kowalski added angina to the list of diagnoses.

The next day, Ms. Brown underwent a positron emission tomography examination or PET scan, which showed a prior anterior and apical myocardial infarction without ischemia and a normal electrical portion of the stress test.[28]

---

[26]     Rec. Doc. 7-1 at 191-192.

[27]     Rec. Doc. 7-1 at 213.

[28]     Rec. Doc. 7-1 at 222.

On October 27, 2010, Ms. Brown was seen at the walk-in clinic for the purpose of refilling her medications.[29]  On November 1, 2010, she returned, complaining that she had a headache all the time.[30]  On December 3, 2010, she again visited the clinic, with a cough, congestion, and complaints of bladder urgency and incontinence.[31]

On January 19, 2011, Ms. Brown again saw Dr. Juneau.[32]  She had not had the studies he recommended at their last visit.  He stated that she should be limited to light duty work, occasionally lifting no more than twenty pounds and frequently lifting up to ten pounds.  He also stated that she should not engage in overhead work or pull or lift patients.  He stated that her work capabilities could be further evaluated after the recommended studies were complete.

Ms. Brown saw her primary care physician at the Crowley Walk-In Clinic on March 2, 2011 for coughing and congestion, and she was diagnosed with bronchitis.[33]

---

[29]     Rec. Doc. 7-1 at 243.

[30]     Rec. Doc. 7-1 at 242.

[31]     Rec. Doc. 7-1 at 241.

[32]     Rec. Doc. 7-1 at 190.

[33]     Rec. Doc. 7-1 at 372.

She returned to the walk-in clinic on April 12, 2011, complaining of left arm and neck pain.[34]  Her doctor prescribed a steroid, an anti-inflammatory, and a pain medication.  He also advised her to follow up with her neurosurgeon.

Ms. Brown saw Dr. Juneau again on May 25, 2011.[35]  In his opinion, and based on the normal lumbar MRI, she had sustained a myofascial type straining injury to her lumbar area in the November 2009 accident, did not require further studies of her legs, and had reached maximum medical improvement with regard to her lumbar spine.  He again reviewed the cervical MRI, examined Ms. Brown, and concluded that her symptoms had lateralized off to the left side and correlated with the MRI findings.  Therefore, he recommended an anterior cervical diskectomy with instrumented fusion at C5-6 and C6-7.

On June 9, 2011,[36] Ms. Brown saw Dr. Kowalksi, and he cleared her for surgery.  He also prescribed Wellbutrin, an anti-depressant.

Ms. Brown returned to the walk-in clinic on July 20, 2011 because of a rash on her neck and to have her medications refilled.[37]  On August 18, 2011,[38] Ms. Brown

---

[34]     Rec. Doc. 7-1 at 371.

[35]     Rec. Doc. 7-1 at 187-189.

[36]     Rec. Doc. 7-1 at 210.

[37]     Rec. doc. 7-1 at 369.

[38]     Rec. Doc. 7-1 at 368.

was again seen at the clinic, complaining about pain shooting down her neck into her shoulder.  She was there again on December 22, 2011,[39] for coughing, congestion, and sinus drip.  She also complained about pain on the left side of her neck and left shoulder pain.  She was seen again on January 12, 2012[40] for cough, congestion, and sores on the back of her tongue.

On February 25, 2012, Ms. Brown was examined by Dr. Mindie Kavanaugh at the request of Disability Determination Services.[41]  Ms. Brown reported that she had heart attacks, diabetes, bronchial asthma, a weak bladder, and bad disks in her neck and back.  She explained to Dr. Kavanaugh that she had a heart attack in 2007 that required stenting and a balloon procedure in 2009 due to restenosis of the stent.  However, she currently had no chest pain or shortness of breath.  She reported that she was diagnosed with diabetes in 2001 and was on insulin and oral medications but without complications.  She reported that she was diagnosed with asthma as a child and uses albuterol every two or three months.  She reported having a weak bladder and occasional urine leakage.  She told Dr. Kavanaugh that she injured her neck and back at work while lifting a patient and stated that she had been awaiting surgery for

---

[39]     Rec. Doc. 7-1 at 367.

[40]     Rec. Doc. 7-1 at 366.

[41]     Rec. Doc. 7-1 at 227-230.

two years.  She reported pain on the right side of her neck with numbness on the left side of her head and right arm pain.  She stated that her legs lock up at night, that the three last toes on her left foot are numb, and that her pain is better when sitting and worse when standing for too long or laying on her left side.  She listed the following medications: Oxybutynin, Lisinopril, Metformin, Lantus, Esomeprazole, Asa, Plavix, Simvastatin, Isosorbide, as well as nitroglycerine as needed.  Dr. Kavanaugh stated that the claimant is independent in activities of daily living.  Upon examination, Dr. Kavanaugh noted normal but painful lumbar flexion and overhead range of motion, an inability to bend or squat without difficulty, difficulty standing up after squatting due to pain, normal strength bilaterally in all muscle groups, and no abnormal reflexes.  Dr. Kavanaugh opined that Ms. Brown should be able to sit, walk, and/or stand for a full workday but would be limited to lifting and carrying objects weighing less than thirty pounds due to heart failure.  She also noted that Ms. Brown should be able to hold a conversation, respond appropriately to questions, remember instructions, and carry out instructions.

On April 26, 2012,[42] Ms. Brown returned to the walk-in clinic, complaining about swelling of her hands, feet, and legs and dry thick skin around her neck.  Lab

---

[42]        Rec. Doc. 7-1 at 233.

work was ordered and medication was prescribed.  Congestive heart failure was added to her diagnoses.

On May 3, 2012, Ms. Brown returned to the clinic,[43] still having swelling.  On May 9, 2012,[44] Ms. Brown underwent an echocardiogram procedure that showed a normal ejection fraction of 62%, mitral regurgitation, trivial tricuspid regurgitation, diastolic dysfunction, and no pericardial effusion or mural thrombus.

On May 21, 2012, Ms. Brown was seen at the Cardiovascular Institute of the South.[45]  She was transferring her care from Dr. Kowalski to Dr. Wade May.  She complained of swelling, fatigue with walking, and pain with exercise that was worse in her left leg than in her right leg.  The next day, she had a stress test that showed a severely abnormal stress score, a moderately reduced stress ejection fraction of 30%, and a mildly dilated end diastolic volume.  The nuclear perfusion imaging showed abnormalities in her heart.

On May 24, 2012, Ms. Brown underwent a lower extremity arterial ultrasound procedure at the Cardiovascular Institute.[46]  No significant stenosis was found in a

---

[43]     Rec. Doc. 7-1 at 232.

[44]     Rec. Doc. 7-1 at 261.

[45]     Rec. Doc. 7-1 at

[46]     Rec. Doc. 7-1 at 269-273.

majority of the arteries studied, and less than 30% stenosis was found in four arteries. An ankle branchial study was also performed, and no significant peripheral vascular disease was detected.

Ms. Brown returned to Dr. May at the Cardiovascular Institute on June 4, 2012 for the results of the testing.[47]  His diagnosis was ischemic cardiomyopathy.  She was advised to quit smoking and given a prescription for nicotine patches.  She was prescribed Toprol, and her Lisinopril dosage was increased.  At that time, her medications were aspirin, Metformin, Simvastatin, Albuterol, Furosemide, Lisinopril, Nexium, nitroglycerin, and insulin.  On June 19, 2012, Ms. Brown had a carotid artery ultrasound and a lipid panel.[48]

On June 28, 2012, Ms. Brown visited the walk-in clinic, complaining of coughing, sneezing, congestion, and fever at night.[49]

The next day, Ms. Brown saw Dr. May in order to obtain clearance for cervical surgery on July 5, 2012.[50]  He noted that, due to her history and multiple risk factors, she had a mildly elevated risk but he also noted that she was asymptomatic at the time

---

[47]     Rec. Doc. 7-1 at 250-251.

[48]     Rec. Doc. 7-1 at 266-268, 324-326.

[49]     Rec. Doc. 7-1 at 363.

[50]     Rec. Doc. 7-1 at 248-249.

and testing was negative.  Therefore, he concluded that the planned surgery presented an acceptable risk.  Dr. May also noted that Ms. Brown was able to do the activities of daily living, including housework, without symptoms.

Ms. Brown saw Dr. Juneau on June 27, 2012 for a pre-operative visit.[51]  He noted that she was continuing to have neck pain and left arm pain and numbness, including some pain that radiates across the right upper trapezius muscle to the right shoulder.  He explained that she was fitted with a non-invasive bone growth stimulator to be worn two to four hours per day for six to nine months after surgery.

On July 5, 2012, Dr. Juneau performed an anterior cervical discectomy with instrumented fusion at C5-6 and C6-7.[52]  Ms. Brown followed up with Dr. Juneau on July 9, 2012,[53] and reported that she had no pain or numbness in her arms, forearms, or fingers.  She was experiencing some nausea and vomiting from the anesthesia, for which Dr. Juneau prescribed medication.  Ms. Brown again followed up on July 17. at that time, her wound was healing well and the nausea and vomiting were better.

---

[51]     Rec. Doc. 7-1 at 278.

[52]     Rec. Doc. 7-1 at 384-385.

[53]     Rec. Doc. 7-1 at 279.

On July 25, 2012, Ms. Brown was seen in the emergency room at Lake Charles Memorial Hospital with chest pain complaints.[54]   She was given medication and released with instructions to follow up with her cardiologist.

Ms. Brown returned to the Cardiovascular Institute on October 29, 2012.[55]   Her medications were modified and additional studies were ordered.

On June 13, 2013, Ms. Brown was seen at Hope Medical for an initial patient evaluation.[56]   She complained of pain on both sides of her neck; left shoulder, arm, and hand pain; low back pain on both sides; and left hip, leg, and foot pain.   She rated her pain as an eight on a scale of one to ten.   She was prescribed Lortab and Gabapentin.

On July 11, 2013,[57] Ms. Brown visited Hope Medical Specialties in Picayune, Mississippi.   She complained of back pain that started in 2009 and was rated an eight on a scale of one to ten.   She reported that her pain goes down to a five with medication. She also reported fatigue, weakness, weight loss, sleep problems, rashes, burning, numbness, tingling, and loss of bladder control.   Her range of motion was

---

[54]      Rec. Doc. 7-1 at 291-314.

[55]      Rec. Doc. 7-1 at 320-323.

[56]      Rec. Doc. 7-1 at 379-381.

[57]      Rec. Doc. 7-1 at 375-378.

limited in the cervical and lumbar spine secondary to pain.  She had muscle spasms. There was point tenderness in the midline paraspinal muscles of the cervical and lumbar spine.  Straight leg raise tests were positive on both sides, she had an antalgic gait, and her discomfort level was severe.  Drug seeking behavior was ruled out.  She was prescribed Zanaflex, Gabapentin, and Lortab.

On August 19, 2013, Dr. Mazen Korab filled out a physical residual functional capacity questionnaire.[58]  He listed Ms. Brown's diagnoses as chronic heart failure with recurrent leg swelling, coronary artery disease, herniated disc disease with spinal surgery, diabetes, and chronic bronchitis.  He noted that she has leg swelling, back and neck pain, activity intolerance, persistent cough, and difficulty breathing.  In his opinion, Ms. Brown can continuously sit for twenty minutes at a time and continuously stand for fifteen minutes at a time.  He opined that she can sit and stand or walk for less than two hours of an eight hour work day.  He stated that she needs to be able to walk for four minutes after sitting for fifteen minutes.  He stated that if Ms. Brown had a sedentary job, she should spend eighty to ninety percent of the work day with her feet elevated above her heart.  He further opined that she should never lift more than ten pounds.

---

[58]      Rec. Doc. 7-1 at 386-391.

-16-

At the hearing on August 26, 2013, Ms. Brown testified that she is constantly in pain, has swelling, is unable to sit for very long, and has shortness of breath.[59]  She testified that her husband does the cooking and her daughter does the housework.[60]  She said pain in her neck prevents her from picking up even a gallon of milk,[61] and explained that Dr. Korab's functional analysis report was completed after he accompanied her to Wal-Mart and observed her in the store.[62]  She stated that, despite the cervical surgery, she remains in pain and lacks mobility in her neck.[63]  She complained of depression but admitted that she is not taking any medication for that condition.[64]  She anticipated seeing a pain management specialist in the near future.[65]

After the hearing, Ms. Brown returned to see Dr. Juneau on October 25, 2013.[66]  At that time, she was eleven months out from cervical surgery.  Dr. Juneau noted that she was having persistent neck and lower back pain, with radiation into both legs

---

[59]     Rec. Doc. 7-1 at 36.

[60]     Rec. Doc. 7-1 at 39-40.

[61]     Rec. Doc. 7-1 at 40.

[62]     Rec. Doc. 7-1 at 42.

[63]     Rec. Doc. 7-1 at 47.

[64]     Rec. Doc. 7-1 at 50.

[65]     Rec. Doc. 7-1 at 51.

[66]     Rec. Doc. 7-1 at 393.

worse in the left leg than in the right leg; numbness and tingling in her left leg and the lateral aspect of the left foot, especially the third, fourth, and fifth toes on her left foot; and interscapular pain and some pain and numbness into the arms and fingers of both hands, especially into the second, third, and fourth fingers.  He recommended MRIs of the cervical and lumbar spine, x-rays of the cervical and lumbar spine, EMGs and nerve conduction studies of both arms and both legs, as well as outpatient physical therapy.

On January 20, 2014, Ms. Brown visited Dr. Gonzalo Hidalgo of the NeuroMedical Clinic of CENLA, L.L.C. in order to establish care upon referral by Dr. Juneau.  She complained of muscle cramps, spasms, and heaviness in her legs, with numbness and tingling that is worse at night.  Dr. Hidalgo noted that Ms. Brown's gait was normal, there was decreased light touch and pin prick sensation in both feet, her deep tendon reflexes in both legs was decreased but equal.  Dr. Hidalgo's impressions were radiculopathy, peripheral neuropathy, and spinal stenosis. He prescribed Cymbalta, Zanaflex, Neurontin, Gabapentin, Spironolactone, Omeprazole, Novolog, Nitroglycerin, Metoprolol Succinate, Metformin, Losartan Potassium, Furosemide, Detrol, Atorvastatin Calcium, and aspirin.

<u>**ANALYSIS**</u>

**A.    <u>STANDARD OF REVIEW</u>**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[67] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[68] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[69]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[70]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the

---

[67]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[68]    *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[69]    *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[70]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

evidence or substituting its judgment for that of the Commissioner.[71]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[72]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[73]

## B.  **Entitlement to Benefits**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[74]  The ALJ found that the claimant does not meet the insured status requirements for purposes of entitlement to disability insurance cash benefits, but she does meet the special insured requirements for

---

[71]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[72]    *Martinez v. Chater*, 64 F.3d at 174.

[73]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[74]    See 42 U.S.C. § 423(a).

Medicare purposes through March 31, 2016, based on her Medicare qualified government employment.  This is not contested.

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[75]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[76]

C.  **Evaluation  Process  and  Burden  of  Proof**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires an ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in

---

[75]     42 U.S.C. § 1382c(a)(3)(A).

[76]     42 U.S.C. § 1382c(a)(3)(B).

or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[77] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[78]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[79] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[80]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[81]

The claimant bears the burden of proof on the first four steps.[82]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can

---

[77]     20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[78]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[79]     20 C.F.R. § 404.1520(a)(4).

[80]     20 C.F.R. § 404.1545(a)(1).

[81]     20 C.F.R. § 404.1520(e).

[82]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

-22-

perform other substantial work in the national economy.[83]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[84]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[85]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[86]

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since November 3, 2009.[87]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  diabetes mellitus, hypertension, coronary artery disease, congestive heart failure, history of myocardial infarction with stent implantation, bronchial

---

[83]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[84]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[85]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[86]     *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[87]     Rec. Doc. 7-1 at 18.

asthma, cervical disc disease, spondylosis, and radiculitis.[88] This finding is supported by evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[89] The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform work at the light level except that she is limited to no more than occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, and no more than occasional crouching, crawling, stooping, kneeling, and balancing. Additionally, the ALJ limited the claimant to working in an environment in which she can avoid pulmonary irritants such as fumes, dust, odors, an gases.[90] The claimant disagrees with the residual functional capacity finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a cashier.[91] The claimant disagrees with this finding.

---

[88]     Rec. Doc. 7-1 at 18.

[89]     Rec. Doc. 7-1 at 19.

[90]     Rec. Doc. 7-1 at 20-21.

[91]     Rec. Doc. 7-1 at 24.

Although the analysis could have ended at that point, the ALJ proceeded to step five, where she alternatively found that there are other jobs in the national economy that she can perform.[92]  Thus, the ALJ found that the claimant was not disabled from November 3, 2009 through March 19, 2014 (the date of the decision) because there are jobs in the national economy that she can perform.[93]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

Ms. Brown contends that the ALJ erred (1) in concluding that there were internal contradictions in Dr. Korab's report that justified discounting his opinions; (2) in concluding that Ms. Brown does not have a listed impairment or a combination of impairments that equals the severity of a listed impairment; (3) in failing to recognize that Dr. Korab's opinions support a residual functional capacity evaluation of less than the full range of sedentary work; (4) in concluding that Ms. Brown has the residual functional capacity to perform light work; and (5) in finding that Ms. Brown can perform her past work as a cashier.  Four of these allegations of error center on the ALJ's failure to give Dr. Korab's report controlling weight.  Therefore, that issue will be addressed separately.  Three of the assignments of error focus on the

---

[92]      Rec. Doc. 7-1 at 25.

[93]      Rec. Doc. 7-1 at 26.

ALJ's residual functional capacity finding, and the final assignment challenges the

ALJ's findings regarding the severity of Ms. Brown's impairments.

**F.   DID THE ALJ ERR IN FAILING TO GIVE DR. KORAB'S REPORT CONTROLLING WEIGHT?**

The Social Security regulations and rulings explain how medical opinions are

to be weighed.[94]  Generally, the ALJ must evaluate all of the evidence in the case and

determine the extent to which medical source opinions are supported by the record.

Although a treating physician's opinions are not determinative, the opinion of a

treating physician who is familiar with the claimant's impairments, treatments, and

responses should be accorded great weight by the ALJ in determining disability.[95]  In

fact, when a treating physician's opinion regarding the nature and severity of an

impairment is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in

the record, the ALJ must give that opinion controlling weight.[96]  If an ALJ declines

to give controlling weight to a treating doctor's opinion, he may give the opinion little

---

[94]      20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[95]      *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[96]      20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

or no weight – but only after showing good cause for doing so.[97]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[98]  Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[99]

In this case, the claimant's treating physician, Dr. Korab, filled out a questionnaire in which he opined that the claimant cannot sit for more than twenty minutes at a time or stand/walk for more than fifteen minutes at a time, that she should neither sit nor stand/walk for more than two hours out of an eight hour work day, and that she should walk for four minutes after sitting for fifteen minutes.  Dr. Korab also opined that the claimant should elevate her feet above her heart for eighty

---

[97]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[98]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[99]     *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

to ninety percent of an eight hour work day if she is doing sedentary work and that she should not lift more than ten pounds.

The ALJ gave Dr. Korab's opinions "little weight," articulating two reasons for doing so.  The first reason was that Dr. Korab's opinions concerning the claimant's needing to walk for four minutes every fifteen minutes was internally inconsistent with his limiting her standing/walking to two hours per day.  In fact, however, these two restrictions are not mathematically inconsistent, and the ALJ's reasoning was consequently flawed.  The second reason given by the ALJ for discounting Dr. Korab's opinions was that they were not supported by treatment notes suggesting such severe limitations.  In support of this, the ALJ points to only two treatment notes, both from cardiologists.  The first of those is the cardiologist's opinion in June 2012[100] that despite multiple risk factors, she was "asymptomatic @ present and testing negative" and therefore cleared for the cervical spine surgery performed by Dr. Juneau.[101]  The second referenced treatment note is that of the cardiologist on October 29, 2012 in which he advised the claimant to quit smoking, decrease her salt intake, and take prescribed medication but did not impose lifting, sitting, standing,

---

[100]    The ALJ stated that this opinion was given in October 2012, but it was actually given just days before Ms. Brown's cervical spine surgery on July 5, 2012.  The reference to October 2012 in the treatment note was for a follow-up appointment.

[101]    Rec. Doc. 7-1 at 249.

or walking restrictions or direct her to elevate her legs.[102]  The ALJ's isolation of these two treatment notes from the claimant's treating cardiologist fails to recognize that Ms. Brown has not only cardiac problems but also a painful cervical spine injury that was not corrected by surgery, neuropathy that might be the result of her diabetes, diabetes, and chronic bronchitis.  Therefore, the two referenced treatment notes are an insufficient basis for discounting Dr. Korab's opinions.

The ALJ gave great weight to Dr. Juneau's opinion of January 19, 2011,[103] in which he sated that she should be restricted to light duty work.  But this opinion was given from the viewpoint of a doctor who dealt only with the claimant's spinal issues and did not treat her heart condition, her diabetes, her chronic bronchitis, or her other medical problems.  Therefore, it is not "consistent with the record as a whole,"[104] as the ALJ suggested.

The ALJ also gave great weight to the light work opinion of the Disability Determination Services's medical consultant who did not examine Ms. Brown and to the light work assessment of the consultative medical examiner who saw Ms. Brown only once.  Neither of those persons had the longitudinal relationship with the

---

[102]     Rec. Doc. 7-1 at 322.

[103]     Rec. Doc. 7-1 at 190.

[104]     Rec. Doc. 7-1 at 24.

claimant that Dr. Korab has had since at least 2009.  Placing greater weight on those opinions than on the opinions of Dr. Korab, who has had a lengthy professional relationship with the claimant, was error.

The claimant argued that Dr. Korab's opinions are entitled to great weight because "[t]he only doctors who treat Mrs. Brown's entire spectrum of issues are her family doctors at Crowley Walk-In Clinic."[105]   This Court finds that argument persuasive.  Dr. Korab was in the best position to know about the effect that all of the claimant's conditions and impairments have on her functionality, and the ALJ erred in failing to give great weight or controlling weight to Dr. Korab's opinions as expressed in the functional analysis of August 9, 2013.  This error requires reversal and remand of the Commissioner's decision.

## G.   DID THE ALJ ERR IN FAILING TO FIND THAT MS. BROWN DOES NOT HAVE A LISTED IMPAIRMENT OR A COMBINATION OF IMPAIRMENTS THAT EQUALS THE SEVERITY OF A LISTED IMPAIRMENT?

The ALJ found that the claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment.  The claimant's representative argued at the hearing that she meets Listing 4.02.  In the ruling, the ALJ found that Ms. Brown meets the criteria for Paragraph A of the listing but does not meet the criteria for Paragraph B of the listing.  In her briefing,

---

[105]    Rec. Doc. 10 at 6.

the claimant presented nothing to contradict that conclusion.  Therefore, this Court finds that the claimant failed to carry her burden of proving that her heart condition satisfies Listing 4.02.

However, the analysis does not end there.  The record establishes that Ms. Brown sustained an injury to her cervical spine and possibly also to her lumbar spine in November 2009, which precipitated her disability claim.  Despite a record replete with evidence of neck pain, lower back pain, MRIs of the cervical and lumbar spine, treatment over several years with two neurosurgeons, and cervical spine surgery, the ALJ did not compare the claimant's symptoms related to her spine condition against the criteria for any listed impairment.

An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[106]  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[107]  The

---

[106]     *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5ᵗʰ Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[107]     *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

ALJ's failure to discuss whether Ms. Brown's spine condition satisfies a listing was an erroneous omission that requires further administrative review.

The ALJ also failed to address whether the combination of all of the claimant's impairments medically equals the severity of one or more listed impairments. When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity to meet a listing.[108] Here, although the ALJ found that Ms. Brown has nine separate severe impairments, she did not explain how the combination of the claimant's various impairments have only a minimal effect on the claimant and would not be expected to interfere with her ability to work. The ALJ included a single conclusory statement – in the title of a section of her ruling – regarding the combination of impairments, stating that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."[109] The ALJ did not explain how she reached that conclusion regarding the combination of impairments. This was error. As noted above, an ALJ has an obligation to discuss the evidence and explain the basis for her findings at every

---

[108]     Loza v. Apfel, 219 F.3d at 393, citing 20 C.F.R. § 404.1523.

[109]     Rec. Doc. 7-1 at 19.

-32-

unfavorable step of the evaluative process.  Because the ALJ did not explain the basis for her conclusion that the combination of Ms. Brown's impairments is not severe, it is impossible for the court to determine whether the ALJ applied the correct legal standard or whether the finding is supported by substantial evidence.  A more thorough explanation of the basis for this finding is necessary.[110]  Accordingly, reversal and remand are required.

## H.  DID THE ALJ ERR IN FINDING THAT MS. BROWN HAS THE RESIDUAL FUNCTIONAL CAPACITY TO PERFORM LIGHT WORK?

The ALJ determined that Ms. Brown retains the functional capacity to perform light work, including her past relevant work as a cashier.  However, as noted above, that conclusion is based upon a flawed weighing of medical opinions.  Accordingly, this finding should be reexamined when Dr. Korab's opinions are given either great weight or controlling weight.

### CONCLUSION AND RECOMMENDATION

This Court finds that the ALJ erred in weighing medical opinions, erred in evaluating whether the claimant's impairments meet or medically equal listed impairments, and erred in evaluating the claimant's residual functional capacity.  The ALJ failed to apply the appropriate legal standards, making it impossible to determine

---

[110]     *Reyes v. Astrue*, No. SA–07CA0389–XR, 2008 WL 2225672, at *4 (W.D. Tex. May 28, 2008).

whether her findings are supported by substantial evidence in the record. Accordingly,

This Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to give great weight or controlling weight to the opinions of Dr. Korab, to determine whether Ms. Brown's impairments satisfy any listings other than Listing 4.02, to determine whether the combination of Ms. Brown's impairments meet or equal the severity of a listed impairment, and to reevaluate Ms. Brown's residual functional capacity.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[111]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[111]     See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 9th day of December 2016.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE